# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 18 2016, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re The Termination Of The Parent-Child Relationship Of:<br><br>M.R.W., M.A.W., Ja.W., Se.W., Sa.W., and C.W. (Minor Children),<br><br>and<br><br>J.R. (Mother),<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | March 18, 2016<br><br>Court of Appeals Case No. 79A02-1506-JT-702<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Trial Court Cause Nos.<br>79D03-1501-JT-1<br>79D03-1501-JT-2<br>79D03-1501-JT-3<br>79D03-1501-JT-4<br>79D03-1501-JT-5<br>79D03-1501-JT-6 |

**Brown, Judge.**

[1]     J.R. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, M.R.W., M.A.W., Ja.W., Se.W., Sa.W., and C.W. (the "Children"). Mother raises one issue which we revise and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

### Facts and Procedural History

[2]     Mother has six children: daughter M.R.W., born March 16, 2005; daughter M.A.W., born March 12, 2006; son Ja.W., born March 4, 2007; daughter Se.W., born April 17, 2010; son Sa.W., born June 6, 2012; and daughter C.W., born June 5, 2013. In 2012, Mother and J.W., who is the father of the Children ("Father," and collectively with Mother, "Parents"),[1] lost their home due to non-payment of taxes following Father's loss of his job. The family lived with extended family before moving into a shelter in Aurora, Indiana, where they stayed for about six or seven months. At the shelter, Mother met Melissa Gabbard, who was a case manager there and who encouraged her to move her family in with Gabbard's boyfriend, Jerry Cantine, and they did so.

[3]     During the time the family lived with Cantine, M.R.W. slept in the same bed as Cantine. Mother was aware that Cantine had a criminal history and was a sex

---

[1] The court also terminated the parental rights of Father. Appellant's Appendix at 65. Father, however, does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

offender. At some point in October 2013, Cantine picked M.R.W. up from school and moved her to the State of Ohio, where he kept M.R.W. in his care. Cantine enrolled M.R.W. in school in Ohio, and she continued to sleep in the same bed as Cantine. Mother signed a document giving Cantine permission to provide medical treatment to M.R.W. and to take her to school, but she said she did not understand the agreement. Parents did not report M.R.W. missing until some time in January 2014. On January 18, 2014, M.R.W. was found in the care of Cantine by Hamilton County Ohio Job and Family Services, and she was removed and placed in foster care.

[4] On February 28, 2014, the Department of Child Services ("DCS") filed a petition alleging that the Children were children in need of services ("CHINS") based on Parents failing to report until January 2014 that M.R.W. had been taken from school without Parents' permission in October 2013. That same day, the court held an initial/detention hearing and formally placed the Children in foster care. The court also accepted transfer of M.R.W.'s case from Ohio, where she had been located and detained.

[5] On April 9, 2014, the court held a factfinding hearing on the CHINS petition, and adjudicated the Children as CHINS. In its fact finding order, the court noted among other things that Mother has a learning disability and that she failed to meet the medical needs of the Children, in that they had severe head lice, one had significant sores on his head, and the infant had severe diaper rash, an upper respiratory infection, and pneumonia. On May 12, 2014, the court held a dispositional hearing, and on May 15, 2014, entered its order

requiring Mother's participation in reunification services, which included therapeutic visitation with the Children, home-based case management, individual therapy, a comprehensive psychological evaluation, random drug screens, and following all recommendations made pursuant to those services.

On August 11, 2014, the court found that Mother had not participated in all visitations with the Children and that the Children's therapists indicated a change or increase in Mother's visitations would be detrimental to the Children's progress. On November 10, 2014, the court held a review hearing and found that the "objectives of the dispositional decree have not been accomplished." DCS Ex. 2 at 16. On January 6, 2015, upon the motion of DCS, the court temporarily suspended visitation between Mother and the Children. On January 16, 2015, the court held a permanency hearing and changed the permanency plan to termination of Parents' parental rights.

On January 16, 2015, DCS filed its termination petitions, and on March 20 and 23, 2015, the court held evidentiary hearings. At the time of the hearings, M.R.W., M.A.W., and Ja.W. were placed in one foster home, Sa.W. and Se.W. were placed in a second home, and C.W. was placed in a third home. The court heard testimony from Rachel Proctor and Kelly Smith, who worked as home-based case managers and visitation facilitators, Vanessa Cochran, a therapist who worked with the Children, Nancy Gehring, the CASA appointed to the Children, Arielle Fallardeau, the therapist working with Mother and Father, Laura Tibbets, the DCS family case manager ("FCM Tibbets"), Jonathan Wade, a therapist who worked with Father, Soledad Smith, a

therapist who worked with Mother, and Margarita Lora, a therapist who worked with Ja.W. Additionally, Mother, Mother's father, and one of Mother's roommates were called to testify by Mother's counsel. Father also testified.

[8] On May 14, 2015, the court entered its Order to Terminate Parent-Child Relationship terminating Mother's parental rights to the Children (the "Termination Order"), containing detailed findings of fact and conclusions of law. The Termination Order contained findings consistent with the above and stated in part:

### FINDINGS OF FACT

\* \* \* \* \*

2. . . . Jerry Cantine reported to officials in Ohio that he had a notarized statement from the parents authorizing him to enroll [M.R.W.] in school and that he was paying the parents $200.00 per week to "keep" [M.R.W.].

3. Jerry Cantine has an extensive criminal history across multiple states including arrests and/or convictions for Sexual Misconduct, Rape, Interference with Custody, Kidnapping, Child Abuse, Felony Possession of Drugs, Possession of Cocaine . . . .

\* \* \* \* \*

5. Although the parents deny exchanging money for [M.R.W.], they admit knowing [M.R.W.] had slept in the same bed with

Jerry Cantine for some time. The children confirmed [M.R.W.] slept in the same bed as Jerry. The children also disclosed that [M.R.W.] had been stolen by "Uncle Jerry" and that she was mad because nobody tried to stop him. Further, the children reported to a school bus driver that the family tried to sell the baby rather than [M.R.W.] but nobody wanted the baby.

6. At the time of removal, the family had no stable housing and no stable income. The family had been staying at homeless shelters for the past year even though they owned a residence. The family was renting the residence to others for $500.00 per month. Neighbors reported the residence was in an unlivable condition when the family left. The residence was eventually sold in a sheriff's sale on September 9, 2013 for non-payment of taxes.

7. In 2012-2013, DCS unsubstantiated six (6) reports regarding the hygiene and health of the children. Two (2) reports of physical abuse (inappropriate discipline) were also unsubstantiated. Further, a sexual abuse report in July 2013 regarding [M.R.W.] and Jerry Cantine was unsubstantiated. Neglect (Lack of Supervision, Environment Life/Health Endangerment) was finally substantiated based on the January 2014 missing child alert.

8. When [M.R.W., M.A.W., and Ja.W.] were enrolled in school, they each had severe head lice that eventually required extremely short and/or shaved haircuts to alleviate the problem. All three (3) of them were grossly behind academically. At the time of removal, the personal hygiene and overall health and well-being of all of the children remained problematic. [M.R.W.] had another severe case of head lice. [Ja.W.] had another severe case of head lice resulting in sores on his head. [Se.W.] had a severe case of head lice as well as a cold that was interfering with sleep. [Sa.W.] had a severe case of head lice and a severe cold affecting his breathing. [C.W.] had a severe upper respiratory

infection and diaper rash both requiring medical attention. Emergency room physicians treated [C.W.] for pneumonia and noted she presented with symptoms of Down Syndrome.

* * * * *

11. Case conferences, family team meetings, and review hearings were held periodically. [DCS] and CASA prepared separate written reports and recommendations prior to each hearing.

12. A permanency hearing was held on January 16, 2015 at which time the permanent plan was determined to be initiation of proceedings for termination of parental rights and adoption. Neither parent had yet shown a real investment in reunification. DCS filed its petitions in the above-referenced Cause No. on January 16, 2015. The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held on March 20, 2015. At the time of the termination hearing, the circumstances of the parents had not improved. The parents were in no better position to care for the children.

13. The parents have a long-term history of housing instability. . . .

14. The parents still do not have independent housing and have taken no concrete steps to obtain independent housing. The parents have been secretive and dishonest regarding current and future living arrangements. The parents are currently residing with three (3) other adults and a teenager in a four (4) bedroom home.

15. Mother is not employed and made little to no effort to obtain employment. Instead, Mother submitted her third application for disability citing learning difficulties and pinched nerves making it

difficult to remain on her feet resulting in a need for pain medication. Mother lacks the motivation to take care of either herself or a home and was discharged from services to assist in obtaining disability for lack of attendance.

* * * * *

18. Mother completed assessments timely. Mother attended appointments and generally participated in services. Mother regularly attended supervised visits as scheduled. However, Mother demonstrated very little engagement and made no progress in achieving therapeutic goals.

* * * * *

20. Neither parent has demonstrated a true understanding of the trauma suffered by the children as a result of neglect and lack of supervision. Neither parent has truly acknowledged responsibility for the abuse inflicted on the children by Jerry Cantine. At times, the parents have demanded physical evidence and refused to accept even the possibility of abuse in order to assist the children.

21. The parents participated in therapeutically supervised visits with the children. Therapists noted tremendous chaos during visits. At the onset of visits, the children would gorge themselves on food. The parents made progress regarding appropriate nutrition for the children and provided activities for the family. The sibling bonds improved over the course of time. However, the level of hostility and aggression observed in the parents increased. Visits were eventually suspended when the parents failed to respond to a choking hazard, became aggressive, and violated visitation guidelines all in the presence of the children.

22. CASA, Nancy Gehring, supports termination of parental rights in the best interests of the children. CASA agrees that adoption is appropriate for the children. The children are doing well in their respective placements and have no special needs that would prevent adoption. The children are adoptable even if their current placement is unable to adopt for any reason. The oldest four (4) children have all disclosed abuse by "Uncle Jerry".

23. [M.R.W.] has disclosed physical, emotional, and sexual abuse by Jerry Cantine including days without being fed. [M.R.W.] has made significant progress in therapy addressing self-hatred and self-banning behaviors. [M.R.W.] is able to express positive emotions and is happy in a concurrent foster placement.

24. [M.A.W.] also disclosed sexual abuse by Jerry Cantine while sleeping in the same bed. [M.A.W.] has made progress in therapy in addressing emotional awareness. [M.A.W.] expresses happiness to be in foster care.

25. [Ja.W.] disclosed physical and sexual abuse by Jerry Cantine specifically stating that "Uncle Jerry" touched his 'no-no' and it hurt. [Ja.W.] defines his 'no-no' as his behind. [Ja.W.] displays a great deal of fear regarding Jerry Cantine.

26. [Se.W.] has also shared experiences of possible sexual abuse. [Se.W.] reports telling Mother that she was touched by Jerry and that Mother told Jerry to stop. [Se.W.] has also made great progress in therapy.

27. When notified of the children's disclosures, both parents initially denied the events could have happened stating the children were always under supervision. The parents vacillated greatly for months regarding the children's trauma at points believing the children and at other points disbelieving the

children. The parents verbalized some responsibility during the CHINS proceeding but subsequent statements indicate otherwise. As recently as February, Mother still stated she does not understand why the children were removed. . . .

28. CASA notes the "crux of whole case" is that neither parent accepts responsibility for DCS involvement a year later. Even at the termination hearing, neither parent was able to fully accept responsibility for the children's abuse. Mother testified Jerry Cantine intimidated and physically assaulted her but that she trusted Ms. Gabbard who introduced the family to Jerry Cantine and that is what caused the family trouble. . . .

* * * * *

30. Although the parents may love the children, neither has the ability to meet the children's needs. It is clearly unsafe for the children to be in the care of the parents. All imaginable services have been offered and nothing is singularly different in today's circumstances since the time of removal. To continue the parent-child relationships would be detrimental to the children. The children need permanency now.

## CONCLUSIONS OF LAW

1. There is a reasonable probability that the conditions that resulted in the removal of the children from the parents' care or the reasons for the continued placement outside the home will not be remedied.

* * * * *

4. For the foregoing reasons, it is in the best interests of [the Children] that the parental rights of [Mother] and [Father] be terminated.

Appellant's Appendix at 61-65.

## *Discussion*

[9] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:

>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. See Ind. Code § 31-35-2-8(a).

[10] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative-in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the

evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[11] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*)). "Our review must 'give 'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[12]    Here, Mother does not challenge the court's conclusions regarding Ind. Code § 31-35-2-4(b)(2)(A) and -4(b)(2)(D). We therefore confine our discussion to the other parts of Section 4(b)(2).

### *Remedy of Conditions*

[13]    We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[14]    In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not

preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[15] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[16] Mother argues that she has made efforts to remedy the conditions causing the Children's removal by attending meetings, in which she "was punctual and organized." Appellant's Brief at 12. She asserts that she did the homework assigned to her, had a positive attitude, and began to make some progress, including providing healthier and more nutritious food and managing the Children's behavior during meals. She argues that she felt betrayed by Gabbard, who introduced her family to Cantine, and accordingly it took her awhile to begin to open up to the DCS case workers. She maintains that she has begun to internalize what she has been taught by her therapist and that her engagement has enabled her to make progress. She argues that she is working with her case manager regarding budgeting, housing, and the Children's behavioral problems and continues to work with her therapist as well.

[17] DCS argues that Mother does not specifically challenge any of the court's findings of fact, that those findings stand as proven, and that this Court need only review the unchallenged findings to determine whether they support the termination judgment. DCS argues that, at the time of the termination hearing, Mother still did not have stable housing and had not benefitted from services to identify sexual predators and the trauma the Children experienced from Cantine. It asserts that the record reflects Mother failed to benefit from individual therapy services, in which she did not make progress "until only a couple sessions just prior to the termination hearing." Appellee's Brief at 32. DCS maintains that Mother continues to deny her responsibility for the sexual abuse experienced by the Children, failed to make a budget to obtain stable

housing, and was residing with a couple she had known for only six months. DCS notes that visitations ceased after the Parents became more aggressive during the visits.

[18] To the extent Mother does not challenge any of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, the court accepted them as true).

[19] The Children were removed from Mother's care due to her failure to provide them with stable housing, the lack of stable income, and the sexual abuse suffered by the Children, especially M.R.W. Regarding abuse, the court in its Termination Order found that Mother put the Children in a situation in which at least M.R.W., M.A.W., and Ja.W became victims of sexual abuse, and Se.W. also spoke of experiences of possible sexual abuse. Mother allowed M.R.W. to sleep in the same bed as Cantine, who she knew to have a history as a criminal and sex offender. Mother allowed Cantine to move M.R.W. to Ohio in October 2013, and she did not report M.R.W. to be missing until January 2014. Cantine reported that he paid Parents $200 per week to keep M.R.W., although Mother denied this. The Children also told their bus driver about Mother's decision to permit Cantine to move M.R.W. and that the family had tried to sell the baby, presumably C.W., rather than M.R.W. but that nobody wanted the baby.

[20] The court found that Mother has not demonstrated a true understanding of the abuse the Children suffered as the result of her neglect and has not acknowledged responsibility for exposing them to Cantine. It found that Mother initially denied that such abuse could have happened, that she vacillated for months regarding the trauma, that she verbalized some responsibility during the CHINS proceeding but that subsequent statements indicated otherwise, and that as recently as February 2015 she stated that she still did not understand why the Children had been removed. It noted that, in the CASA's view, the "crux of whole case" is that Mother has not accepted responsibility for DCS's involvement and that at the termination hearing she did not fully accept responsibility for the Children's abuse, claiming that it was the result of intimidation and physical assaults by Cantine. Appellant's Appendix at 65. The court found that, although Mother completed assessments in a timely fashion and generally participated in services, she has demonstrated little engagement and has not made progress in achieving therapeutic goals. It found that the supervised visits were chaotic and that the level of hostility and aggression Mother displayed at the visits increased over time, resulting in the suspension of those visits when she failed to respond to a choking hazard and became aggressive. In addition, the court found:

> The parents made limited to no progress toward understanding sexual abuse, recognizing signs of trauma in children, identifying potential perpetrators, parenting victims of sexual abuse, or preventing children's victimization. Neither parent has the ability to make safe decisions for the children. The parents are likely to allow anyone with resources needed by the family to

access the children. The family plan at the time of termination was for the children to be returned to the home where the parents currently reside with Father working while Mother provides supervision. The parents do not know the full background of all of the adults residing in that home. Further, the owner of the home offered to become a foster placement for the children after knowing the parents for only a short period of time and the parents agreed.

*Id.*

[21] Also, regarding stable and suitable housing and income, the court found that Mother has a long history of housing instability, she still does not have independent housing and has not taken steps toward obtaining such housing, she has been secretive and dishonest regarding her living arrangements, and that currently she and Father are residing with three other adults and a teenager in a four-bedroom home. The court found that Mother has not made an effort to obtain employment and instead has submitted multiple applications for disability, in which she cites learning difficulties and pinched nerves as reasons for qualifying for disability. For her part, Mother argues only that she is working with her case manager and her therapist on budgeting and housing, in which she cites to her own testimony for the proposition.

[22] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied.

## *Best Interests*

[23] We next consider Mother's assertion that DCS did not present clear and convincing evidence that termination was in the Children's best interests. She argues that the service providers agree that Mother loves her Children and wants to help them have a better future. She notes that currently the Children are divided between three foster homes and that once the therapeutic visits ended the siblings who were not sharing a foster home were no longer able to be together except on three occasions. She also asserts that the Children "seemed to enjoy visits with their parents." Appellant's Brief at 18.

[24] We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[25] At the termination hearing, FCM Tibbets testified that termination was in the Children's best interest for many reasons, including that Mother has not benefitted significantly from services provided and that she does not have the necessary housing, income, or transportation to provide for the six Children. Also, when asked whether it was in the Children's best interest to be returned to Mother, CASA Gehring testified that they should not be returned and that she did not believe the Children "would be safe, even from the get go." Transcript at 73. Based on these statements, as well as the totality of the evidence in the record and set forth in the Termination Order, including Mother not reporting M.R.W. for three months following Cantine taking her to Ohio, reports that M.R.W., M.A.W., Ja.W., and Se.W. had been sexually abused, Mother's lack of suitable housing and income, and her limited progress with services, we conclude that the court's determination that termination was in the Children's best interests is supported by clear and convincing evidence. *See In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied*.

## Conclusion

[26] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[27] Affirmed.

Kirsch, J., and Mathias, J., concur.